UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JILL DERAIN,

    Plaintiff,

               Case No.: 05-CV-70935-DT

vs.

               HON. GEORGE CARAM STEEH
               MAG. JUDGE WALLACE CAPEL, JR.

COMMISSIONER OF
SOCIAL SECURITY,

    Defendant,

_____/

## REPORT AND RECOMMENDATION

**I.  RECOMMENDATION**

   It is recommended that the Court deny Plaintiff's Motion for Summary Judgment, grant Defendant's Motion for Summary Judgment and enter judgment for Defendant.

**II.  REPORT**

   This is an action for judicial review of the Defendant Commissioner's final decision denying Plaintiff's application for disability insurance benefits [DIB].  Plaintiff signed her application for DIB on December 6, 2001, alleging that she has been disabled and unable to work since March 27, 2001,[1] due to "[h]erniated disc in lower back [and] bilateral carpal tunnel."  (TR 41-44, 59). Benefits were denied initially on March 28, 2002.  (TR 26-31).  A de novo hearing was held on

_____

[1]Plaintiff's Adult Disability Report indicates that she became unable to work on March 28, 2001.  (TR 59).

1

January 15, 2004, before Administrative Law Judge [ALJ] Lawrence Blatnik. (TR 301[2]-47). In a decision dated February 26, 2004, the ALJ found that Plaintiff could perform a limited range of sedentary work. (TR 19). Accordingly, Plaintiff was found not disabled. The Appeals Council denied a request to review the decision on February 10, 2005. (TR 4-6). Plaintiff has commenced this action for judicial review.

## A.    PLAINTIFF'S TESTIMONY

Plaintiff testified that she lives between Owosso and Flint at 530 South and Thirteen in Lennon, Michigan. (TR 306). She testified that she is married and her spouse is employed. (TR 306-07). She stated that she and her husband live alone. (TR 308). She stated that she was born August 21, 1960, and was forty-three at the time of the hearing. (TR 306). She reported that she is five foot, three inches tall, and weighs two hundred and ten pounds. Id. She stated that her weight has increased, mostly likely due to inactivity and possibly side effects from her medication. Id.

She reported that she currently receives a disability pension in the amount of approximately $753.00 a month from General Motors [GM] for her medical retirement. (TR 307). She stated that she has received same since April 2003. Id. Additionally, she receives $583.10 a week in worker's compensation benefits.[3] Id.

Plaintiff reported that she has a driver's license and drives locally everyday to therapy, out to lunch with her retired father, or grocery shopping. (TR 308). She stated that her husband drove her to the hearing. Id.

---

[2]The undersigned notes that the page number "301" was stamped twice within the record. This citation refers to the second page number, "301."

[3]The ALJ noted that Plaintiff first received $400.00 a week in worker's compensation and then it went up to $583.10 a week. (TR 333).

She testified that she has an associates degree in Social Service and a Bachelor of Science in Criminal Justice from Ferris State, but she worked for GM for the past fifteen years doing production line work until March of 2001, when GM was unable to find a position that met her restrictions. (TR 308-09). She testified that the Flint Medical GM doctor gave her the following restrictions: "[n]o torque guns, no pushing or pulling, no bending, no lifting over five or 10 pounds . . . That's all - - pushing, pulling, grabbing, gripping." (TR 309-10).

She stated that when she left GM she was working with the wiring at the back side of instrument panels. (TR 310). She stated that it required a lot of fine manipulation, which became a problem for her. Id. She reported that she was doing that job for about four or five months before she had to stop. (TR 311).

Prior to that, Plaintiff testified that she installed ashtrays and cup holders for GM with a special glove to pound in same. Id. She stated that neither job required her to do heavy lifting, but both did require a lot of bending. Id. She indicated that lifting the dashboards for the instrument panel job was "awkward," but not heavy. Id. She stated that the same job required her to stand most of the time. (TR 312).

Prior to those jobs, she stated that she worked in combination as a press operator and a conveyor attendant, performing the latter most often. Id. She explained that she took doors, hoods, and fenders "off the line and put them in their racks, move the racks up . . . closed them up. When they were short on people, then I would become a press operator but that was not very often." Id. She stated that she lifted up to twenty pound hoods and doors, which were raw sheet metal. Id.

She testified that prior to the combination position, she worked as a security person for GM on the weekends patrolling the inside of the plant and during the week at the pedestrian truck gate.

(TR 313).  She stated that she was standing or walking most of the time and checking trailers at the gate.  Id.  She stated that she lifted about ten pounds.  Id.  She explained that she left the position to do the production line work because GM was outsourcing the security operations.  Id.  She stated that she preferred the security position, but was left without a choice.  (TR 314).

Plaintiff reported that she has not done any work, volunteer or otherwise since leaving GM in March 2001.  Id.  She testified that her back prevents her from working.  Id.  She reported that the pain goes down into her left leg to her ankle and sometimes affects her ability to walk.  (TR 315).  She stated that she has had back problems about three and a half years, neck pain for about two and a half years, and problems with her hands for about three and a half years.  Id.

She testified that she believes these problems are a result of the repetitive work that she did for GM.  (TR 316).  She stated that Dr. Levin in Saginaw has been her treating physician for the past three years.  Id.  She reported that she continues to see him on a six month basis and more often when a specific problem occurs.  Id.  She stated that she last saw him three months prior to the hearing and was scheduled to call for an appointment in April.  Id.

Plaintiff stated that she was referred to Dr. Grias and Dr. Diaz by Dr. Levin, but she only saw them on a one-time basis.  (TR 316-17).  She reported that Dr. Diaz has proposed surgery on her back, but she wants to pursue other options first.  (TR 317).  She stated that she has never had any surgeries on her back or hands.  Id.  She stated that carpal tunnel surgery has also been proposed, but again, she wants to pursue other options, first.  (TR 317-18).  She stated that she has been through a lot of physical therapy and recently stopped a few weeks before the hearing.  (TR 318).  She also reported going in the earlier part of last year and explained that she has to stretch out her visits because her insurance only allows sixty visits per year.  Id.  She stated that the physical

4

therapy has "[d]efinitely" helped her, although it has not "cured' her. Id. She explained that although she gets better in physical therapy, she plateaus and she has never been able to get back to her pre-injury condition. (TR 328).

She testified that she also has exercises that she does at home. (TR 319). She added that her husband bought her an inversion table a few years ago, which she uses three or four times a week for ten minutes at a time and it also helps her. Id. She explained that she hangs upside down from her ankles. Id.

Plaintiff testified that while sitting at the hearing her back and leg were "not feel[ing] good." (TR 320). She stated that the pain is constant. Id. She stated that her pain medications, "deaden" the pain and "alleviate it somewhat." Id. She stated that her back pain has stayed the same or worsened since she stopped working. Id. She stated that in addition to medication and exercises, she uses heating pads and stretches to help with the pain. Id. She stated that some activities, such as vacuuming, emptying the dishwasher, standing too long, walking up and down a lot of stairs, and walking in rough terrain in her yard, aggravate the pain. (TR 320-21).

Plaintiff reported that she can only stand about thirty minutes before she gets "antsy" and has to sit or lay down because of her back pain. (TR 321). She also stated that she can only walk for about thirty minutes at a time. Id. Additionally, she reported that she can only sit for an hour to an hour and a half. Id. She testified that when she is at home she is most comfortable laying down with her feet propped up and she has learned this through experience. (TR 321-22). She reported that the most she could lift or carry would be ten pounds on a "good" day, and nothing on a "bad" day. (TR 322).

Plaintiff explained the difference between her "good" and "bad" days. (TR 322). She stated that on a "bad" day her pain is worse, possibly because she did something to aggravate it the day before. Id. She stated that on average, she has two or three "bad" days per week. Id.

She stated that she does not have difficulty bending over, but coming back up is what bothers her. Id. She stated that she cannot stay in a squatting position for long. Id. She stated that she would "rather go downstairs than upstairs," and she does not use the stairs to her basement often. (TR 322-23). She explained that her laundry and everything is on the first floor. (TR 323).

Plaintiff stated that her hands and fingers cause her difficulty; for example, she stated that if she writes a letter she has to take breaks. Id. She stated that she is right handed. Id. She reported that if she were to paint a room in her house, she would "pa[y] for it for the next couple [of] days." Id. She stated that she has a computer at home and can only use the keyboard for about ten or twelve minutes before her hands go numb. Id. She stated that she can open a jar "sometimes," but if not she has her husband do it. Id. She stated that she sometimes has trouble with buttons and jewelry. (TR 332).

She stated that she has not been hospitalized in the last three years. (TR 324). She reported that she also sees Dr. Walker, her family physician, on an as needed basis. (TR 324). She stated that she smokes cigarettes and has cut back to "half to a pack a day" since she left work. (TR 324). She explained that she used to smoke two to two and a half packs per day and although she has tried to quit completely, she has been unsuccessful. Id. She stated that she does not drink alcohol, except for possibly at Christmas. (TR 324-25). Plaintiff reported that although she wears glasses, she does not have any other vision or hearing problems. (TR 325).

Plaintiff testified that she is a night person and usually does not go to bed until three or four in the morning. (TR 325). She explained that she stays up and watches television or does housework. Id. She stated that she gets up at ten or eleven in the morning. Id. She stated that she does not sleep straight through the night and wakes up once or twice, sometimes due to numbness in her hands. (TR 325-26). She stated that she does not have any difficulty taking care of her grooming, bathing, or dressing. (TR 326). She states that she prepares her meals and goes out to eat once a week. Id. She stated that she can do most household tasks, but it just takes her longer to complete same. Id. She stated that she cannot sustain household or gardening activities for more than ten to fifteen minutes without a ten to fifteen minute break. (TR 331-32). She stated that she naps three or four times a week for two or three hours at a time. (TR 332).

She stated that when she goes shopping it helps her to lean on the basket for support and she has her husband bring in the groceries. (TR 326-27). She stated that she goes grocery shopping once or twice a week. (TR 327). She stated that she does the laundry at her house, but does not do outdoor work, except to use the riding lawn mower if she has to mow the lawn. Id. She stated that she only mowed the lawn once last year. Id. She reported that she gardens, but she sits while doing same and her husband helps her. (TR 327, 332).

Plaintiff testified that she went to Sault St. Marie and St. Agnes for her tenth anniversary a couple years prior to the hearing. Id. She stated that she usually does not travel farther than Detroit, where her family lives. Id. She stated that she used to crochet as a hobby, but stopped two years ago. (TR 327-28). She stated that she also enjoys gardening, trying new recipes, and playing with her dog. (TR 327).

7

The ALJ asked Plaintiff if she was offered a desk job where she could sit or stand as needed, but had to work eight hours, five days a week, if she could do same. (TR 328-29). The Plaintiff stated that she could not because she needs to lay down at some point and her medication interferes with her ability to focus and concentrate. (TR 329). She stated that she lays down daily for sixty to seventy percent of the time. (TR 331).

She testified that she takes Prozac, Darvocet, and Vioxx. (TR 329). She reported that she takes each everyday, except for the Darvocet, which she takes three or four times a week as needed. Id. She testified that her medications interfere with her concentration. Id. She then clarified that it is the Darvocet and Vioxx that cause her the problems. (TR 329-30). She stated that she is not aware of any other side-effects. (TR 330). She stated that she has been taking Prozac "[t]o some degree, [for] the past eight years." Id.

Plaintiff testified that she saw a mental health professional about a year and a half prior to the hearing for her panic disorder and anxiety attacks. Id. She stated that she saw two different people at different times for about three to five months. Id. She stated that her doctor prescribed Xanax in the event of an anxiety attack, but she stated that she no longer suffers from same; however, she takes Prozac to deal with any attacks. Id. She stated that Dr. Walker prescribes the Prozac and it helps her. (TR 331).

**B.     MEDICAL EVIDENCE**

Examinations of the parties' cross-motions for summary judgment reveal that an additional recitation of the Plaintiff's medical evidence would be repetitive. The pertinent record medical evidence relied upon by this Court is fully articulated in the Analysis.[4]

---

[4]See Subpart E, supra.

### C.        VOCATIONAL EXPERT'S TESTIMONY

Dr. Norman Abeles, a vocational expert [VE], testified at the hearing.  (TR 334-43).  The VE categorized Plaintiff's past work as a panel installer as light and unskilled; as a production worker installing brackets and cup holders as light and unskilled; as a conveyor attendant with occasional press operation work as light and unskilled; and a security guard as light and unskilled.  (TR 335-36).  The ALJ asked the VE to assume a claimant with Plaintiff's age, education, and work experience and to further assume that such a claimant "could stand, walk or sit all for at least six hours a day out of an average eight-hour workday," but "could not do - - could not use any air, power, vibratory, torque tools, anything of that nature, would need to avoid uneven terrain."  (TR 336).

The VE testified that under such a hypothetical the claimant could probably do the past security guard position as well as her other past positions.  (TR 336-37).  The ALJ added the following limitations: "only occasional bending, twisting or turning, no repetitive twisting or turning of the neck, could do only occasional stooping, kneeling, crouching or crawling, as well as only occasional pushing, pulling, overhead reaching with the upper extremities."  (TR 337).  The VE stated that the additional limitations would preclude all the past relevant work.  Id.  However, the VE added that

> [s]he could do the security guard as long as she didn't have to examine the trailers. In other words, she could do the patrol work and she could work at the gates so she did that some of the time so she could do part of that security job, maybe not all of it the way she described it, although there are security guard jobs where you only patrol - - where you only let people in the gates and you don't have to check the trailers.

(TR 338).

9

The ALJ asked the VE whether there were any other jobs at the light level.  Id.  The VE testified that there would be some "bench jobs, like a machine feeder or an inspector or a weigher or an examiner or a machine operator or a polisher or a sander or production helper and similar jobs along those lines that would meet the criteria." (TR 338-39).  The VE stated that there were "about 45,000 such jobs as long as you did them on a full-time basis." (TR 339).  The VE added that there would also be about 35,000 full-time attendant jobs such as desk clerk, telemarketer, information clerk, office building attendant, and cashier.  Id.  The ALJ asked whether an additional sit/stand option would affect the listed positions.  Id.  The VE testified that it would reduce the attendant positions to 20,000 and the bench jobs to 12,000 positions.  Id.

The ALJ then asked what sedentary jobs existed with all the limitations previously mentioned and the sit/stand option.  Id.  The VE testified that the same job titles, but separate actual positions, would fit the hypothetical, but that the attendant jobs would be reduced to 15,000 and the bench jobs would be reduced to 10,000 positions. (TR 340).  The ALJ then asked whether additional limitations of "no repetitive handling or fingering work with either hand," would impact the listed positions.  Id.  The VE stated that it would eliminate the bench jobs, but not the attendant and clerk positions, which would remain at the same number of positions as previously testified. (TR 340, 342).  The VE stated that his testimony was consistent with the Dictionary of Occupational Titles [DOT], but that the positions relating to the sit/stand option was based on his personal observations. (TR 340-41).  The VE stated that he also "used the Unskilled Employment Quarterly from the U.S. Publishing Company in Kansas City, [his] own observations and [his] general knowledge over the years." (TR 341).

The ALJ then asked the VE to assume that Plaintiff's testimony regarding her pain, discomfort, and limitations, were fully credible. (TR 342).  The VE stated that such a person would

not be capable of any work due to her need to "lay down. She takes naps three to four days a week. Her medications make her sleepy sometimes. She has pain and - - both in her legs and her arms and her neck and the combination of all these factors [] would not make her able to do sustained work on a regular basis." Id.

Plaintiff's counsel questioned the VE. (TR 342-43). Plaintiff's counsel asked whether the attendant jobs "require more than occasional use of the hands for gripping, grasping, handling, [or] fingering." (TR 342). The VE stated that the positions listed did not require same, either in the sedentary or light category. (TR 342-43).

### D.    ALJ'S CONCLUSIONS

After reviewing the testimony presented at the hearing and the medical evidence in the record, the ALJ found that "[t]he claimant has the medically determinable impairments of degenerative disc disease and radiculopathy of the lumbar spine; carpal tunnel syndrome, bilateral; and a cervical radiculopathy," but she does not have an impairment either alone or in combination, sufficiently severe to meet or medically equal the criteria of any condition in the Medical Listings in Appendix 1, Subpart  P, Regulations No. 4. (TR 15). The ALJ found Plaintiff's allegations regarding her limitations are not totally credible. (TR 18-19, 20). He determined that Plaintiff had the residual functional capacity [RFC] to perform a limited range of sedentary work. (TR 19). Therefore, the ALJ concluded that Plaintiff is not eligible for DIB. (TR 21).

### E.    ANALYSIS

Plaintiff advances two claims in her Motion for Summary Judgment. Her Motion argues that the ALJ's decision is not supported by substantial record evidence because: (1) "the Commissioner erred as a matter of law by improperly concluding that [Plaintiff] did not meet or equal Listing

1.04A;" and (2) "the Commissioner erred as a matter of law in assessing [Plaintiff's] credibility."[5]

In response, Defendant's Motion for Summary Judgment contends that the ALJ's decision is supported by substantial evidence.[6]  The matter is now ready for decision.

### 1.    Standard of Review

The findings of the ALJ regarding Plaintiff's disabled status are conclusive if supported by substantial evidence based on the record as a whole.  42 U.S.C. § 405(g) (1997).  Substantial evidence means such evidence as a reasonable mind might accept as adequate to support a conclusion.   Richardson v. Perales, 402 U.S. 389, 401 (1971).  It is more than a scintilla of evidence, but less than a preponderance of evidence.  Brainard v. Sec'y of Health and Human Servs., 889 F.2d 679, 681 (6th Cir. 1989).

This standard presupposes that there is a "zone of choice" within which the ALJ may make a decision without being reversed.  Felisky v. Bowen, 35 F.3d 1027, 1035 (6th Cir. 1994).  Even if the court might arrive at a different conclusion, an administrative decision must be affirmed if it is supported by substantial evidence.  Mullen v. Bowen, 800 F.2d 535, 545 (6th Cir. 1986).  Finally, consideration of the whole record does not mean that the ALJ must mention or comment on each piece of evidence submitted.  Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998); see also Thacker v. Comm'r of Soc. Sec., 99 Fed.Appx. 661, 665 (6th Cir. 2004) (unpublished).  Applying these standards, I will analyze each of Plaintiff's claims.

---

[5]Plaintiff's Motion for Summary Judgment and Brief filed July 8, 2005 (hereinafter "Plaintiff's Brief"), at page 7.

[6]Defendant's Motion for Summary Judgment and Brief filed July 28, 2005 (hereinafter "Defendant's Brief"), at pages 11-16.

a.      **Listing 1.04A**

Plaintiff argues that the ALJ erred in finding that she did not meet Listing 1.04A.  Listings

1.04 and 1.04A state:

> 1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

20 C.F.R. § 404, Pt. 404. Subpt. P, App. 1.  Even if Plaintiff satisfies the first part of the listing under

1.04, she fails to show how she meets all of the requirements of 1.04A.

Although, there are no cases discussing the specific requirements of Listing 1.04A, Plaintiff

must prove that she meets all the criteria of Listing 1.04A; therefore, she must show:  "(1) evidence

of nerve root compression characterized by neuroanatomic distribution of pain, (2) limitation of

motion of the spine, (3) motor loss (atrophy with associated muscle weakness or muscle weakness)

accompanied by sensory or reflex loss, and (4) positive straight-leg raising test (sitting and supine)."

Robinson v. Barnhart,  2005 WL 2148931, *5 (W.D.Tex. 2005) (slip copy August 29, 2005).

As Defendant aptly points out, Plaintiff only refers to three exhibits as evidence that she

meets Listing 1.04A.[7]

> [O]n June 7, 2001, Dr. Levin reported positive straight leg raising in her left leg as well as slightly decreased strength (4+ instead of 5) in terms of hip flexion, reduced (4/5) strength in foot dorsiflexion, and a mildly antalgic gait. Plaintiff's Brief at 8, referring to Tr. 143. Four months later, Dr. Levin reported that Ms. Derain's examination findings were unchanged (Tr. 142). Yet, in March 2002, in a report that

---

[7]Defendant's Brief at pages 12-13.

is not discussed anywhere in Ms. Derain's brief, Dr. Friedman reported negative straight leg raising results with both legs (Tr. 108). Dr. Friedman also reported a full range of motion in Ms. Derain's lumbosacral spine and Dr. Friedman observed that Ms. Derain walked with a normal gait (id.). Thus, at the very minimum, Dr. Friedman's examination, done within one year of Ms. Derain's alleged onset date (March 27, 2001), showed that she lacked the limitation of motion in her lumbosacral spine, and the report also showed that she lacked the positive result in straight leg raising tests.

The only other findings cited by Ms. Derain in her brief come from Dr. Levin's report from April 8, 2002 (Tr. 245). This report does not even contain a suggestion that Ms. Derain has limitation of motion in her lumbar spine. Rather, Ms. Derain again highlights Dr. Levin's findings of positive straight leg raising in one (the left) leg, sightly reduced hip flexion, and foot dorsiflexion decreased sensation in her left toe, and a mildly antalgic gait. Plaintiff's Brief at 8, citing Tr. 245.

Thus, in none of her citations to the record has Ms. Derain even suggested that a physician reported limitation of motion in her spine. Moreover, as noted, one doctor of record, Dr. Friedman, unequivocally reported full and active lumbosacral spinal motion (Tr. 108).  Moreover, in addition to Dr. Friedman, two other physicians of record, Drs. Diaz and Grias also saw Ms. Derain and failed to find limitations of spinal motion or positive results on straight leg raising tests. On February 19, 2003, Dr. Diaz reported that Ms. Derain walked with a normal gait. Dr. Diaz also reported negative results in both legs on straight leg raising tests, and Dr. Diaz reported a full range of motion for Ms. Derain's lumbosacral spine (Tr. 298). Dr. Grias, also in February 2003, reported negative results on straight leg raising tests (Tr. 300).[8]

Moreover, the most recent physical therapy notes of May 21, 2003, report the following: "ROM Progress: improved.  THORACIC: flexion: 120 [degrees]; extension: 50 [degrees]; lateral flexion: L 45 [degrees], R 50 [degrees]; rotation L80 [degrees], R 110 [degrees], LUMBOSACRAL: flexion: 60 [degrees]; extension 30 [degrees]; lateral flexion: L, 10, R 10 [degrees]; rotation: L, 60, R 80 [degrees].  Bilateral l/e arom wfl."  (TR 174).  However, the same physical therapy notes indicate "[d]ecreased trunk arom" as a "problem."  Id.  Additionally, the physical therapy notes indicate that she is "[m]aking steady progress."  (TR 175).

---

[8]Defendant's Brief at pages 12-13.

In Miller v. Comm'r of Soc. Sec., 181 F.Supp.2d 816, 819 (S.D.Ohio 2001), "the ALJ did not discuss the evidence or his reasons for determining that appellant was not disabled at [S]tep [T]hree, or even identify the relevant Listing or Listings; he merely stated a summary conclusion that appellant's impairments did not meet or equal any Listed Impairment." The court found that "[s]uch a bare conclusion is beyond meaningful judicial review." Miller, 181 F.Supp.2d at 819. However, in the present case, the ALJ *did* identify Listing 1.04A in his decision. (TR 15). He also discussed her treatment for lower back problems. (TR 16-18).

Contrasting Miller, with another district court decision is instructive. In Dunlap v. Barnhart, 2004 WL 784837, *12 (W.D.Tenn.,2004) (unpublished disposition), relying on several published cases from the 6th Circuit, the district court found that

> the claimant has the burden of establishing that she meets a listed impairment, and an impairment meets a listing only when it manifests the specific findings described in the medical criteria for the particular impairment. See 20 C.F.R. § 404.1525(d); Evans v. Sec'y of Health & Human Servs., 820 F.2d 161, 164 (6th Cir.1987). Upon review of the entire record, Dunlap has not met her burden in the present case. Although the claimant has challenged the sufficiency of the ALJ's analysis at the third step, Dunlap has not offered specific evidence to indicate that she meets or has an impairment equal to the criteria of any applicable Medical Listing. Additionally, when an ALJ makes a disability determination after "a thorough review of the medical evidence of record" in deciding that a claimant does not meet a listed impairment, a "more elaborate articulation" is not required. Gooch v. Sec'y of Health & Human Servs., 833 F.2d 589, 592 (6th Cir.1987). In this case, the ALJ came to a conclusion based on "all of the evidence" and found that Dunlap did not meet "any" Medical Listing. His conclusion was not contradicted by any of Dunlap's treating physicians or any of the state agency physicians that reviewed Dunlap's medical history and records at the initial and reconsideration levels of disability determination.

Thus, taking the record, as a whole, given that the present Plaintiff's range of motion was essentially within normal limits as indicated by Dr. Friedman, the disability consultant, (TR 113), Dr. Diaz's finding of "full range of motion of the lumbrosacral spine," (TR 298), and the lack of

15

notation by other doctors regarding a limited range of motion of the spine, as required by Listing 1.04A, the ALJ's decision was not without substantial evidence on that matter.  Further, the lack of recent positive straight-leg raising test, (TR 298, 300), also supports the ALJ's decision.  Therefore, because there was lack of medical support for *at least* these two elements under Listing 1.04A, the ALJ did not err in finding that Plaintiff failed to meet the Listing requirements.

### b.    Credibility

Plaintiff alleges that the ALJ improperly assessed her credibility.[9]  In evaluating subjective complaints of disabling pain, this court looks to see whether there is objective medical evidence of an underlying medical condition, and if so then:  1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or, 2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.  McCoy on Behalf of McCoy v. Chater, 81 F.3d 44, 47 (6th Cir. 1995) (quoting Stanley v. Sec'y of Health and Human Servs., 39 F.3d 115, 117 (6th Cir.1994) (citing Jones v. Sec'y of Health and Human Servs., 945 F.2d 1365, 1369 (6th Cir.1991) and (quoting Duncan, 801 F.2d at 853).

In order to determine disability based on subjective complaints, we look to 20 CFR § 404.1529(c)(3) and the following factors:

1. The individual's daily activities;
2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;
3. Factors that precipitate and aggravate the symptoms;
4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

---

[9]Plaintiff's Brief at pages 9-13.

6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 minutes to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

As Social Security Ruling (SSR) 96-7p points out, the ALJ's "determination or decision must contain specific reasons for the finding on credibility . . . to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." See also, Murray v. Comm'r of Soc. Sec., 2004 WL 1765530, *4 (E.D. Mich., Aug. 3, 2004) (slip copy).

Specifically, Plaintiff argues that the ALJ did not apply the aforementioned test, but rather made a conclusory statement, mentioning household tasks.[10] However, the ALJ specifically discussed Plaintiff's medical treatment and daily activities. (TR 18-19). He stated that

> [t]he claimant testified at her hearing that she could not stand or walk for more than thirty minutes and that she could only sit for a maximum of one and one-half hour. On a "good" day, she could lift ten pounds. It was her further testimony that she had difficulty rising from a bend, ascending stairs, writing and operating a keyboard. The claimant also testified that she cooked, did housework, shopped for groceries one to two times per week, and did laundry and gardening. As discussed above, Dr. Friedman stated that the claimant had no difficulty picking up a paper clip from his palm with either hand, holding a pen in her dominant right hand and writing her name legibly. The claimant did not report to him any symptoms regarding walking, and she walked with a normal gait without an assistive device. At that examination, she had no difficulty stepping onto and off a nine inch high step stool leading with either the left or right leg (Exhibit 2F).
> The claimant has never been hospitalized due to her conditions and has elected to forego numerous treatment options available. The results of the tests administered and discussed herein did not suggest a disabling condition and were, at best, in several instances inclusive. None of the claimant's treating physicians have expressed the opinion that she is totally disabled and she seems to have shown some improvement through conservative treatment such as epidural injections without surgery. The claimant also has a generally good range of activities of daily living, which include gardening, shopping, cooking and other household tasks. The

_____

[10]Plaintiff's Brief at pages 11-12.

undersigned, therefore, finds that the claimant's allegations of inability to work due to her pain and limitations are not fully credible in light of the record as a whole.

\*        \*        \*

As discussed above, the objective medical evidence does not provide a basis for finding limitations greater than those determined in this decision.  In addition, consideration of the factors described in 20 CFR § 404.1529(c)(3) and Social Security Ruling 96-7p also leads to a conclusion that the claimant's allegations of disabling symptoms and limitations cannot be accepted.  Therefore, the residual functional capacity finding in this case is justified.

(TR 18-19).  This analysis is hardly conclusory.  However, as Plaintiff points out, the ALJ specifically neglected to mention her testimony regarding her need to nap and the side-effects of her medications.  (TR 331-32).[11]  Specifically, Plaintiff testified that her medications interfere with her ability to focus and concentrate.[12]

Defendant argues that Plaintiff "cannot point to a single instance in the record that demonstrates she complained to any of her doctors about a need to lie down or that she identified fatigue as an adverse medication side effect. Indeed, Dr. Levin reported that Ms. Derain was tolerating her medications (Tr. 142)."[13]  A review of the entire record reveals that Defendant is correct.  Further, in her "Disability Report," Plaintiff reported "none" in response to whether she had any side-effects to her listed medications, including Vioxx, Darvocet, and Flexeril.  (TR 64).  Plaintiff testified at the hearing that it was the Vioxx and Darvocet which caused the side-effects.  (TR 329-30).  Where "[t]he claimant complained of side effects from his [or her] medication for the first time at the hearing, [and] none of the medical reports indicate that he or [she] complained to a doctor about the side effects," such a complaint is not entitled to credibility.  Steiner v. Sec'y of Health and Human Servs., 859 F.2d 1228, 1231 (6th Cir. 1987).

---

[11]Plaintiff's Brief at pages 12-13.

[12]Plaintiff's Brief at page 12.

[13]Defendant's Brief at page 15.

18

Plaintiff argues that "[t]he ALJ discounted [her] credibility/testimony in order to deny benefits."[14]  As Defendant points out

> administrative hearings are non-adversarial. See Sullivan v. Hudson, 490 U.S. 877, 891 (1989) (proceeding for Social Security disability benefits are not adversarial). Nevertheless, it is true that the vocational expert testified that if the ALJ found all of Ms. Derain's testimony credible, she could not perform any jobs due to her alleged need to lie down and nap as frequently as three times each week (Tr. 342). The problem here is the same as the problem above. The record contains no instance during which Ms. Derain told any physician about her alleged need to lie down. Thus, the ALJ did not find Ms. Derain's testimony not credible so that he could deny benefits.[15]

Additionally, in Howard v. Sec'y of Health and Human Servs., 932 F.2d 505, 509 (6th Cir. 1991), the Sixth Circuit articulated its position on such "aspersions" well:

> This suggestion that bigotry underlay the ALJ's determination that Howard was not eligible for benefits, a claim completely unsupported in the record before this court, was not well received by this panel and will not be countenanced in the future by this court. Counsel are advised that personal aspersions, whether they be cast at opposing counsel or members of the judiciary, have no place in argument before us unless they are strictly pertinent to a legal issue, such as the imposition of Rule 11 sanctions or claims of judicial or prosecutorial misconduct.

Therefore, because Plaintiff complained of the side-effects and a need to nap only at the hearing and the record indicates no reports of same, rather it reflects the contrary in terms of side-effects, the ALJ's decision was supported by substantial evidence.

Lastly, it is noted that although Plaintiff points out that the ALJ cannot rely on a VE's testimony unless it is "given in response to a hypothetical question that accurately describes the plaintiff in all significant, relevant respects," under Felisky v. Bowen, 35 F.3d 1027, 1036 (6th Cir. 1994), Plaintiff fails to develop any further argumentation.  "Issues adverted to in a perfunctory

---

[14]Plaintiff's Brief at page 13.

[15]Defendant's Brief at page 16.

19

manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to....put flesh on its bones." McPherson v. Kelsey, 125 F.3d 989, 995-96 (6th Cir. 1997) (citations omitted).

## III.   **CONCLUSION**

For the reasons stated, I find that the ALJ's decision denying Plaintiff benefits is substantially supported in the record.  Accordingly, I respectfully recommend that the Court **DENY** Plaintiff's Motion for Summary Judgment, **GRANT** Defendant's Motion for Summary Judgment, and enter judgment for Defendant Commissioner.

Pursuant to Fed.R.Civ.P. 72(b) and 28 U.S.C. § 636(b)(1), the parties are hereby notified that within ten days after being served with a copy of the recommendation they may serve and file specific, written objection within ten days after being served with a copy thereof.  The parties are further informed that failure to timely file objections may constitute a waiver of any further right of appeal to the United States Court of Appeals.  United States v. Walters, 638 F.2d 947 (6th Cir. 1981).

In accordance with the provisions of Fed.R.Civ.P. 6(b), the court in its discretion, may enlarge the period of time in which to file objections to this report.

s/Wallace Capel, Jr.
**WALLACE CAPEL, JR.**
**UNITED STATES MAGISTRATE JUDGE**

**Dated:**   January 24, 2006

20

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**

**CERTIFICATE OF SERVICE**

I hereby certify that on January 24, 2006, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following: Janet Parker, Assistant United States Attorney, 101 First Street, Suite 200, Flint, Michigan 48708, and Mikel E. Lupisella, 1121 N. Michigan Avenue, Saginaw, Michigan 48602-5369.

and I hereby certify that I have mailed by United States Postal Service the paper to the following non-ECF participant(s):  Social Security Administration, Office of the Regional Counsel, 200 W. Adams Street, 30th Floor, Chicago, Illinois 60606  .

s/James P. Peltier
United States District Court
Flint, Michigan 48502
810-341-7850
E-mail: pete_peltier@mied.uscourts.gov

21